NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JOHANNA M., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, Y.L., *Appellees.*

No. 1 CA-JV 18-0045
FILED 8-16-2018

Appeal from the Superior Court in Maricopa County
No. JD21747
JS19051
The Honorable Jo Lynn Gentry, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge David D. Weinzweig joined.

---

**H O W E**, Judge:

**¶1**        Johanna M. ("Mother") appeals the juvenile court's order terminating her parental rights to her daughter Y.L. on the grounds of mental deficiency, chronic substance abuse, and prior termination within two years. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        Mother has four children. Mother's parental rights to her oldest child, Y.S., were severed in 2012. Three years later, Mother tested positive for opiates and methamphetamine after giving birth to A.L. Three weeks later, A.L. was hospitalized for failure to thrive. When questioned, Mother was unable to understand or explain why A.L. was sick. The Department of Child Safety petitioned for dependency as to A.L. and his older sister F.L. The Department offered Mother a myriad of services including substance-abuse treatment, domestic violence classes, and referrals for a psychological evaluation; Mother did not comply with services and never attended an evaluation. Mother instead requested substance-abuse treatment services through Phoenix Dream Center, but did not complete the program. In December 2016, after Mother failed to appear at the severance hearing, the juvenile court severed her parental rights to F.L. and A.L.

**¶3**        Trevor L. ("Father")[1] assaulted Mother in March 2017 after both used methamphetamines. Mother was eight months pregnant with Y.L. Mother suffered two black eyes and strangulation marks on her neck. Glendale police brought Mother to Dream Center, where she has resided throughout the pendency of this case. Mother gave birth to Y.L. the following month.

---

[1]     The juvenile court also severed Father's parental rights to Y.L., but he is not a party to this appeal.

¶4            Shortly thereafter, the Department took temporary custody of Y.L. and placed her with F.L.'s and A.L.'s adoptive parents. The Department also petitioned for dependency, alleging that Mother was unable to provide proper and effective parental care and control of Y.L. because of substance-abuse issues, mental-deficiency issues, and domestic-violence issues. Mother denied the allegations. In June, the Department moved to terminate Mother's parental rights on the grounds of mental deficiency, chronic substance abuse, and prior termination within two years.

¶5            During this time, Mother participated in services at Dream Center. She had visitation with Y.L. and took classes for anger management, domestic violence, parenting skills, and substance abuse. Mother also participated in drug testing with no positive tests since using methamphetamine with Father in March.

¶6            In June and July, Mother participated in a psychological evaluation. The psychologist opined that Mother was in the mentally deficient range for intelligence, verbal comprehension and reasoning, nonverbal reasoning, and memory. He noted that Mother appeared "confused or unable to process information adequately[,]" which was consistent with an intellectual disability. Mother explained that she had never legitimately or legally obtained work because she lacked identification and had been homeless before. The psychologist testified that Mother "is recovering from a methamphetamine addiction which, along with her intellectual disability, has interfered significantly with her capacity to raise a child in a safe and effective fashion." He stated that Mother would have an extremely difficult time learning, retaining, and consistently implementing safe and effective parenting practices. Finally, the psychologist concluded that reasonable grounds existed to believe Mother's condition would continue for a prolonged, indeterminate period.

¶7            In August and November 2017, the juvenile court heard evidence on the Department's termination motion. The Department's case manager testified that Mother's services through the Department included parent-aide services, a psychological evaluation, and case-aide supervised visits. She stated that the Department had referred Mother for parent-aide services in May, but difficulties in reaching Mother by e-mail or phone delayed her participation in parent-aide services until August 1. The case manager noted that additional services would be futile because no services would help with Mother's intellectual capacity. She further testified that Mother did not have the capacity to parent Y.L. because she was unable to understand a child's needs or to provide for herself or a child in her care,

and solely depends on Dream Center's assistance. Lastly, the case manager opined that termination would be in Y.L.'s best interests based on the parents' history of substance abuse and domestic violence, Mother's cognitive ability, and because Y.L.'s current placement was meeting all her needs and wanted to adopt Y.L.

¶8        Mother's psychologist testified consistently with his evaluation. The psychologist testified that Mother's intellectual disability would significantly affect her parenting skills and that a child in her care would be at risk for neglect. Mother's reliance on others made it easier for her to be victimized, which would place her and the child at risk. The psychologist also noted his concern that Mother had no personal or social resources to support her and that she relied on Dream Center for all her needs, which was unlikely a permanent option. He believed that additional services to help Mother's parenting ability would be futile.

¶9        Mother testified that she had been sober for nine months, had completed numerous services at Dream Center, and had successful visits with Y.L. Mother admitted that if Y.L. were returned to her the two would depend on the Dream Center or another housing resource. She also admitted that she did not have any identification or a birth certificate, making self-sufficiency difficult. Mother acknowledged that her intellectual disability makes it difficult to understand written and verbal communication. A Dream Center director testified that Mother was doing well in her services and had reached step four of Dream Center's four-step program. She also testified that Mother had just recently been offered a job as a seamstress through a Dream Center affiliate, but that her schedule and pay had yet to be determined. The director stated that she repeats information or redirects the conversation when Mother struggles to process the information. The director testified that Dream Center was not a permanent housing solution, but that Mother could potentially live there for a couple more years.

¶10        The juvenile court found that Mother had a mental deficiency. The court also found that Mother could not meet Y.L.'s basic needs or discharge her parental responsibilities because she lacked identification of any kind and had no way to become legally employed. Mother's intellectual disability caused her to have "limited insight and she is likely to be easily victimized and exploited as a result." The court further found that it would be "exceptionally difficult" for Mother to independently parent Y.L. and that the mental deficiency would continue for a prolonged, indeterminate period. The court recounted the services the Department offered Mother and her participation in those services, finding that the Department made

reasonable efforts to reunify the family. Finally, the court found that termination was in Y.L.'s best interests because (1) Y.L. was adoptable and adoption by her current placement would allow her to be raised with her siblings, (2) termination would further the plan of adoption and provide permanency and stability, and (3) Y.L. was thriving in her current placement's care and placement was meeting all her needs. Mother timely appealed.

## DISCUSSION

### 1. Statutory Ground for Termination

¶11        Mother argues that insufficient evidence supports the juvenile court's order terminating her parental rights to Y.L. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009). This Court views the evidence and reasonable inferences to be drawn from it in the light most favorable to affirming the juvenile court's order and will not reverse unless no reasonable evidence supports its factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549 ¶ 7 (App. 2010); *see also Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1 (App. 2008). Further, "[i]f clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 3 (App. 2002).

¶12        To terminate parental rights, the court must find by clear and convincing evidence one of the statutory grounds for termination and by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). As pertinent here, the court may terminate parental rights for mental illness or mental deficiency under A.R.S. § 8–533(B)(3) when (1) the Department has made reasonable efforts to provide appropriate reunification services, (2) the parent is unable to discharge parental responsibilities because of the mental illness or mental deficiency, and (3) the condition is reasonably likely to continue for a prolonged, indeterminate period. A.R.S. § 8–533(B)(3); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 191–92 ¶¶ 29–33 (App. 1999). Mother does not challenge the juvenile court's findings that she suffered from a mental deficiency that was reasonably likely to continue for a prolonged,

indeterminate period. Mother instead contends that insufficient evidence exists to support the juvenile court's findings that the Department provided reasonable efforts and she is unable to discharge her parental responsibilities.

¶13    The record supports the juvenile court's finding that the Department made reasonable efforts to provide appropriate reunification services. Mother was already participating in services at Dream Center when she gave birth to Y.L. Mother elected to participate in services at Dream Center because she was comfortable there. Dream Center provided Mother with urinalysis testing and parenting, domestic violence, and addiction classes. In addition to receiving these services, the Department offered Mother case-aide supervised visits, parent-aide services, and a psychological evaluation. Although the Department did not refer Mother for any additional services to address her mental deficiency, her psychologist testified that any such services would be futile. *See id*. at 192 ¶ 34 (holding that the Department is not required to undertake rehabilitative measures that would be futile).

¶14    Mother counters that the Department failed to make reasonable efforts to provide appropriate services because the Department failed to offer her services "for a period of months." But the record shows that the Department referred Mother for parent-aide services in May and a parent aide was assigned in June. The case manager testified that parent-aide services did not start August 1 because of difficulties reaching Mother. The case manager also testified that the Department referred Mother for the psychological evaluation at the end of April and that the Department did not have control over when the evaluation would be scheduled. Mother ultimately participated in the evaluation in June and July. Further, the case manager stated that the Department did not immediately offer Mother other mental-health services because it did not know which services would benefit Mother until the psychological evaluation was completed. As such, reasonable evidence supports the juvenile court's finding that the Department made reasonable efforts to provide reunification services.

¶15    The record also supports the juvenile court's finding that Mother is incapable of discharging her parental responsibilities because of her mental deficiency. "[T]he term parental responsibilities is capable of being understood by persons of ordinary intelligence as referring to those duties or obligations which a parent has with regard to his [or her] child." *Maricopa Cty. Juv. Act. No. JS-5894*, 145 Ariz. 405, 408–09 (App. 1985). "This court has previously stated that the term is not intended to encompass any exclusive set of factors but rather to establish a standard which permits a

trial judge flexibility in considering the unique circumstances of each termination case . . . ." *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 378 ¶ 20 (App. 2010).

**¶16** Mother is entirely dependent on Dream Center. She testified that if Y.L. was returned to her care that the two would either live at Dream Center or find other housing resources. But as of the termination hearing, Mother had no identification and although she had just been offered a job, the offer was from a Dream Center affiliate. Mother and the director did not know Mother's schedule, what she would be paid, or if the job was permanent. The psychologist opined that Mother was dependent on others and would not be able to independently parent Y.L. He also determined that a child in Mother's care would be at risk because of difficulty she has with learning, retaining, and consistently implementing safe and effective parenting practices. Mother disclosed that she had once been homeless and never had legal employment. On this record, reasonable evidence supports the court's finding that Mother is unable to discharge her parental responsibilities.

### 2. Best Interests

**¶17** Mother contends that the juvenile court erred by finding that termination was in Y.L.'s best interests. Termination of parental rights is in a child's best interests if the child will benefit from the termination or will be harmed if the relationship is not terminated. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 ¶ 20 (App. 2014). Relevant factors to consider in determining if a child will benefit from termination include whether the current placement is meeting the child's needs and if the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016).

**¶18** Here, the record supports the juvenile court's finding that termination was in Y.L.'s best interests. Y.L. had been with her current placement since she was born. Y.L.'s placement had already adopted her two older siblings, F.L. and A.L., and wanted to adopt Y.L. The case manager testified that the placement was meeting Y.L.'s needs and Y.L. was thriving in the placement's care. Thus, the juvenile court did not err.

**CONCLUSION**

**¶19**     For the foregoing reasons, we affirm the juvenile court's order terminating Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:  AA